990 So.2d 314 (2008)
Benjamin Russell WOOD, Jr.
v.
Alfred Q. BOOTH et al.
1060953.
Supreme Court of Alabama.
February 22, 2008.
*315 Mark G. Montiel, Montgomery, for appellant.
Troy King, atty. gen., and James W. Davis, asst. atty. gen., for appellees Autauga County Judge of Probate Alfred Q. Booth and Secretary of State Beth Chapman.
Robert D. Segall and Shannon L. Holliday of Copeland, Franco, Screws & Gill, P.A., Montgomery, for appellees Edgar C. Gentle III, Marvin Wise, Jean Gerber, Cynthia A. Bell, and Joe Turnham, in his individual capacity.
Joe C. Espy III of Melton, Espy & Williams, P.C., Montgomery, for appellees the Alabama Democratic Party and Joe Turnham, in his official capacity.
PER CURIAM.
Benjamin Russell Wood, Jr., appeals from a judgment of the Montgomery Circuit Court dismissing Wood's action against Alfred Q. Booth, in his official capacity as probate judge of Autauga County, and Nancy Worley, in her official capacity as secretary of state of Alabama.[1] We affirm.

*316 Facts and Procedural History

On October 13, 2006, Wood, a registered voter and a resident of Autauga County, sued Judge Booth and the secretary of state in the Autauga Circuit Court. Wood sought the revocation of the certificates of nomination that had been issued after the primary election to four candidates for the state senateLowell Barron, Roger Bedford, Zeb Little, and Hank Sanders.[2] Barron, Bedford, Little, and Sanders had not been opposed in their respective districts in the June 6, 2006, primary election, and the secretary of state had certified those candidates on August 31, 2006, as the nominees of the Democratic Party for the office of state senator in their respective districts. Wood also sought to have those candidates' names removed from the ballot for the November 7, 2006, general election.
Wood's complaint sought a declaratory judgment, an injunction, a writ of mandamus, and a writ of quo warranto. The complaint alleged that Barron, Bedford, Little, and Sanders had failed to file certain reports required to be filed by the Fair Campaign Practices Act ("the FCPA"), formerly § 17-22A-1 et seq., Ala. Code 1975 (currently codified at § 17-5-1 et seq., Ala.Code 1975).[3] Specifically, the complaint alleged that, before the June 6, 2006, primary, Barron, Bedford, Little, and Sanders had not filed the reports described in former § 17-22A-8 (currently § 17-5-8) of the FCPA.[4]
Judge Booth and the secretary of state filed an answer to the complaint on October *317 25, 2006. Among other things, the answer asserted that Wood's action was an untimely election contest and that the trial court did not have jurisdiction to hear Wood's claims.
On October 30, 2006, the Alabama Democratic Party; its chairman, Joe Turnham, acting in his individual and official capacities; and two voters moved to intervene in the action.[5] The intervenors also filed a motion to dismiss, asserting, among other things, that the trial court did not have subject-matter jurisdiction and that Wood had failed to join indispensable parties; a motion to transfer the case to the Montgomery Circuit Court; and a cross-claim and third-party complaint that named various probate judges, the secretary of state, and Republican senatorial nominees Jabo Waggoner, Harri Anne Smith, Del Marsh, and Steve French. The intervenors' complaint alleged that Waggoner, Smith, Marsh, and French also had failed to file pre-primary reports under the FCPA. The intervenors requested that, in the event the trial court granted the relief Wood requested, the trial court also grant similar relief to the intervenors against Waggoner, Smith, Marsh, and French.
The Autauga Circuit Court granted the intervenors' motion to intervene and later granted the intervenors' motion to transfer the case to the Montgomery Circuit Court.[6] In the Montgomery Circuit Court, the intervenors filed an amended cross-claim and third-party complaint alleging that 26 additional Republican candidates for various offices had violated the FCPA, but the intervenors did not attempt to add those candidates as parties to the action.
On January 9, 2007, the intervenors filed additional materials in support of their pending motion to dismiss. The intervenors asserted that Senators Barron, Bedford, Little, and Sanders had been elected at the November 7, 2006, election, that they had taken the oath of office and had received certificates of election, and that, under Art. IV, § 46 and § 51, Ala. Const. 1901, the trial court did not have jurisdiction to hear the action.
On March 15, 2007, after the parties had filed several additional pleadings, the Montgomery Circuit Court entered an order dismissing the action on the basis that the court did not have jurisdiction. Specifically, the order asserted that the court did not have jurisdiction under Art. IV, § 46 and § 51, Ala. Const.1901. Wood filed a timely notice of appeal, and the intervenors filed a cross-appeal.[7]

Standard of Review
"`[B]ecause the underlying facts are not disputed and this appeal focuses on the application of the law to those facts, there can be no presumption of correctness accorded to the trial court's ruling.' Beavers v. County of Walker, 645 So.2d 1365, 1373 (Ala.1994) (citing First Nat'l Bank of Mobile v. Duckworth, 502 So.2d 709 (Ala.1987)). Appellate review of a ruling on a question of law is de novo. See Rogers Found. Repair, Inc. v. Powell, 748 So.2d *318 869 (Ala.1999); Ex parte Graham, 702 So.2d 1215 (Ala.1997)."
Ex parte Forrester, 914 So.2d 855, 858 (Ala.2005).

Discussion
This appeal presents issues similar to those we addressed in Roper v. Rhodes, 988 So.2d 471 (Ala.2008), in which we considered whether the Crenshaw Circuit Court had jurisdiction in an action filed by William Roper and Cynthia Roper just before the November 7, 2006, general election seeking to have a candidate's name removed from the ballot. William was a candidate in the June 6, 2006, primary election to select the Democratic Party's nominee for the Crenshaw County Board of Education, district 1. William and Ronald A. Rhodes participated in a runoff election on July 18, 2006, that resulted in a tie vote. William lost to Rhodes in a "domino draw" conducted by the Crenshaw County Democratic Party, and on August 14, 2006, Rhodes was certified as the Democratic nominee. 988 So.2d at 472.
On October 30, 2006, the Ropers filed an action in the Crenshaw Circuit Court against the probate judge of Crenshaw County and the secretary of state. Like Wood's requests for the revocation of the certificates of nomination issued to the senatorial candidates and for the removal of their names from the ballot for the general election, the Ropers sought the revocation of the certificate of nomination issued to Rhodes and the removal of his name from the general-election ballot.[8] Additionally, the Ropers' action was based on alleged violations of the FCPA by Rhodes before the primary and runoff elections. 988 So.2d at 477.
Similar to Wood's allegations regarding the senatorial candidates in the present case, the Ropers claimed that Rhodes had violated § 17-22A-8 (currently § 17-5-8) of the FCPA, and the Ropers asserted that the circuit court had jurisdiction to enforce § 17-22A-21 (currently § 17-5-18) of the FCPA, which requires, under certain circumstances, the revocation of a certificate of election or nomination issued to a candidate who has not complied with the FCPA.
After discussing the FCPA, various provisions of Title 17, Ala.Code 1975, and cases interpreting both, we held that the trial court did not have jurisdiction to hear the Ropers' claims. 988 So.2d at 477. Our holding was based first on the conclusion that, to the degree it sought to obtain relief based on alleged violations of the FCPA that occurred before the primary and runoff elections, the Ropers were claiming that Rhodes was ineligible to participate in those elections, and, therefore, that the Ropers' action was an attempt to contest those elections. 988 So.2d at 477. We then noted that § 17-15-6 (currently § 17-16-44), Ala.Code 1975,
"prohibits a court from exercising jurisdiction over any proceeding seeking to
"`ascertain[] the legality, conduct or results of any election, except so far as authority to do so shall be specially and specifically enumerated and set down by statute; and any injunction, process or order from any judge, court or officer in the exercise of chancery powers, whereby the results of any election are sought to be inquired into, questioned or affected, or whereby any certificate of election is sought to be inquired into or questioned, save as may be specially and specifically enumerated and set down by statute, shall be null and void.'

*319 "(Emphasis added.) See also Etheridge v. State ex rel. Olson, 730 So.2d 1179, 1182 (Ala.1999) (`We note again, as we have done on previous occasions, that a court does not have jurisdiction to interfere in an election result unless a statute authorizes it to do so. The Legislature has made this abundantly clear. See § 17-15-6.' (emphasis added))."
Roper, 988 So.2d at 477-78. We then stated:
"Under Harvey [v. City of Oneonta, 715 So.2d 779 (Ala.1998)], and Davis [v. Reynolds, 592 So.2d 546 (Ala.1991)], to the extent the Ropers alleged that Rhodes violated the FCPA before the primary and runoff elections, the Ropers were contesting those elections on the basis that Rhodes was allegedly ineligible to be a candidate in those elections. A procedure for contesting primary and runoff elections is set forth in §§ 17-16-70 to -89 [currently §§ 17-13-70 to -89], Ala.Code 1975, and § 17-16-71(2) includes the ineligibility of a candidate as a ground for contesting a primary or runoff election. However, the Ropers did not follow the procedure outlined in §§ 17-16-70 to -89, Ala.Code 1975, and the Ropers have not cited another statutory provision that authorized their action to the extent it contested the primary and runoff elections on the basis that Rhodes was allegedly ineligible to be a candidate in those elections. Consequently, the trial court did not have jurisdiction to hear the Ropers' claims alleging FCPA violations that occurred before the primary and runoff elections. See also Dunning v. Reynolds, 570 So.2d 668 (Ala.1990); Ex parte Skidmore, 277 Ala. 221, 168 So.2d 483 (1964)."
988 So.2d at 478. Finally, we held in Roper that, because the Ropers had not pursued an election contest in compliance with Title 17, the trial court did not have jurisdiction to hear any claims regarding an alleged violation of the FCPA before the general election. 988 So.2d at 478.
As noted, like the Ropers' claim against Rhodes in Roper, Wood alleges that Barron, Bedford, Little, and Sanders failed to file reports that Wood contends they were required to file under the FCPA before the primary election. Roper held that to the extent the Ropers sought to disqualify Rhodes from participating as a candidate in the general election because of violations of the FCPA that allegedly occurred before the primary and runoff elections, the Ropers' claim against Rhodes was an untimely attempt to contest those elections.
However, Wood's claims regarding alleged violations of the FCPA are presented in a different factual context than were the claims in Roper. Roper involved an untimely attempt to contest the nomination of a candidate for office who was opposed in the primary election; in the present case, the candidates who are alleged to have violated the FCPA were unopposed in the primaries in their respective senatorial districts. Consequently, the names of Barron, Bedford, Little, and Sanders did not appear on the ballots in the primary election.[9] Therefore, unlike *320 the Ropers, who could have used the procedure outlined in former §§ 17-16-70 to -89 (currently §§ 17-13-70 to -89), Ala. Code 1975, for contesting a primary election, it is not clear that Wood could have filed a statutory election contest of the primary.[10] If he could have availed himself of those statutory provisions following the primary, then under § 17-15-6 (currently § 17-16-44), as construed in Roper, the trial court would have had no jurisdiction over Wood's claims that were filed on October 13, well after the primary and the issuance of the certificates of nomination to Barron, Bedford, Little, and Sanders. However, if Wood could not have used those procedures, then his case arguably is distinguishable from Roper. In any event, it is not necessary for us to decide whether Wood could have presented his claims through the statutory procedure for contesting a primary election, because as this case is presented to us, we cannot resolve it in a manner that will afford relief to Wood.
In Bell v. Eagerton, 908 So.2d 204, 205 (Ala.2002), this Court noted that "`[i]t is not the province of this Court to resolve an issue unless a proper resolution would afford a party some relief'" (emphasis omitted) (quoting Kirby v. City of Anniston, 720 So.2d 887, 889 (Ala.1998)). Bell involved an appeal from a judgment of the Montgomery Circuit Court disqualifying Fred Bell as a candidate for Lowndes County district court judge. Following the primary election, the Reform Party certified Bell on June 29, 2000, as its candidate for Lowndes County district court judge, and the secretary of state certified Bell as the Reform Party candidate on August 11, 2000. However, on August 21, 2000, Nancy Lamar Eagerton filed an action in the Montgomery Circuit Court seeking to prevent Bell's name from appearing on the general-election ballot on *321 the basis that Bell did not meet the 12-month residency requirement of § 12-74-64, Ala.Code 1975. 908 So.2d at 204.
After a trial, the Montgomery Circuit Court issued a judgment on October 13, 2000, declaring that Bell did not meet the residency requirement of § 12-74-64 and that he was therefore not qualified for office. On October 18, 2000, Bell filed a notice of appeal to this Court and moved the trial court for a stay of its October 13 judgment. 908 So.2d at 204. On October 19, the trial court denied the motion for a stay, and Bell moved this Court to stay the trial court's judgment. 908 So.2d at 204-05. However, on October 31, this Court denied the motion for a stay. 908 So.2d at 205.
The general election occurred on November 7, 2000, and Bell's name did not appear on the ballot. Bell did not attempt to enjoin the election "or the certification and the installation of the victorious candidate as the Lowndes County district court judge." 908 So.2d at 205. Bell also did not "contest the election pursuant to § 17-15-22 [currently § 17-16-49], § 17-15-27 [currently § 17-16-54], § 17-15-28 [currently § 17-16-55], and § 17-15-32 [currently § 17-16-59], Ala.Code 1975." 908 So.2d at 205.
Bell asked this Court "to reverse the judgment of the trial court and to order a new election for the office of Lowndes County district court judge." 908 So.2d at 205. However, Eagerton argued that the appeal was moot. She cited former § 17-15-6 (currently § 17-16-44), Ala.Code 1975, "for the proposition that Bell's failure to contest the election deprive[d] this Court of jurisdiction to nullify the election." 908 So.2d at 205. Eagerton argued "that the occurrence of the election itself and the certification and installation of Terri Bozeman as Lowndes County district court judge pursuant to that unchallenged election render[ed] impossible the relief sought by Bell on appeal." 908 So.2d at 205.
In agreeing with Eagerton, this Court stated:
"`A court does not have the jurisdiction to interfere in an election result, unless a statute authorizes it to do so. Ala.Code 1975, § 17-15-6, divests courts of such jurisdiction....
"`"....
"... However, this Court identified an exception to § 17-15-6 in City of Adamsville [v. City of Birmingham, 495 So.2d 642 (Ala.1986)]:
"`This Court has held that these provisions [in § 17-15-6], which formerly appeared in the 1940 Code as Tit. 17, § 235, do not prevent the enjoining of an election.[11]Dennis v. Prather, 212 Ala. 449, 103 So. 59 (1925). See also Birmingham Gas Co. v. City of Bessemer, 250 Ala. 137, 33 So.2d 475 (1947).
"`Furthermore,
"`"In Dennis v. Prather, 212 Ala. 449, 103 So. 59, 62, this court, commenting upon the argument that if the election to be held is void it could be tested by other proceedings and there was no occasion for injunctive relief, said:

*322 "`"`We think this is not an adequate remedy. It means the useless incurring of all the expense, loss of time, and inconvenience of holding the election, and the confusion and uncertainty which would follow such conditions....
"`"`All the expense and inconvenience to the voters and taxpayers of the county would be useless. It seems a plain duty to so determine beforehand. The rights and interests of the electorate are better promoted by a decision in advance, advising the commissioners of their want of power, and restraining them from proceeding with a meaningless and useless election.'
"`"Like reasoning was employed in City of Mobile v. Mobile Electric Co., 203 Ala. 574, 84 So. 816 [(1919)]; and the case of Coleman v. Town of Eutaw, 157 Ala. 327, 47 So. 703 [(1908)], likewise sustains this view. See also Petree v. McMurray, 210 Ala. 639, 98 So. 782 [(1923)]."
"`Birmingham Gas Co., supra, 250 Ala. at 140, 33 So.2d at 477.'
"495 So.2d at 645."
Bell, 908 So.2d at 206-07. The Court then stated:
"[B]ecause Bell did not seek and obtain an injunction to stop the November 7, 2000, election for Lowndes County district court judge, and because Bell did not contest the election of Terri Bozeman to that office, this Court cannot nullify her election or order a new election. § 17-15-6, § 17-15-22, § 17-15-27, § 17-15-32, City of Talladega [v. Pettus, 602 So.2d 357 (Ala.1992)], and City of Adamsville, supra. Accordingly, Bell's appeal is moot and must be dismissed. Kirby [v. City of Anniston, 720 So.2d 887, 889 (Ala.1998)], supra."
908 So.2d at 207.
In the present case, Wood sought to enjoin the general election. However, once the election occurred Wood did not file an election contest. Among other things, the appellees contend that Wood's failure to file an election contest deprives the judiciary of jurisdiction over Wood's claims.
Wood contends that he was not required to file an election contest. Instead, he contends that he
"can obtain the statutory relief described in [former § 17-22A-21 (currently § 17-5-18), Ala.Code 1975]. The revocation of the certificates of election issued to Barron, Sanders, Bedford, and Little on December 29, 2006, is mandatory pursuant to the statute. The revocation of the certificates of election may shift the debate on the status of the offending state senators to the legislative branch. See Alabama Constitution Article IV Sections 46, 51, 54, 60."
(Wood's brief, p. 21.)
We disagree with Wood's assertion that he was not required to file an election contest following the general election. The statutory provision Wood is seeking to enforce is former § 17-22A-21 (currently § 17-5-18), Ala.Code 1975, which then stated:
"A certificate of election or nomination shall not be issued to any person elected or nominated to state or local office who shall fail to file any statement or report required by [the FCPA]. A certificate of election or nomination already issued to any person elected or nominated to state or county office who fails to file any statement or report required *323 by this chapter shall be revoked."[12]
Although § 17-22A-21 provides the basis for the substantive remedy Wood seeksthat is, the revocation of the certificates of election issued to Barron, Bedford, Little, and Sanders on December 29, 2006, after the general electionit does not provide the procedure for obtaining that remedy; instead, that procedure is stated in those sections of Title 17 governing the contest of a general election. See Roper, 988 So.2d at 478-79 (quoting Harvey v. City of Oneonta, 715 So.2d 779, 780-81 (Ala.1998)), and 988 So.2d at 481 (Bolin, J., concurring specially) ("[A]n election contest provides the `where' and `when' remedy to pursue a failure-to-file transgression of § 17-5-18 [formerly § 17-22A-21] of the FCPA"). By not filing a statutory election contest after the general election, Wood chose not to use the procedure provided by the legislature for a party seeking to obtain, under § 17-22A-21, the revocation of a certificate of election issued after the general election.
Thus, Barron, Bedford, Little, and Sanders have taken office through a general election for which no election contest has been filed. Consequently, if this Court or the trial court were to grant the relief requested by Woodthe revocation of the certificates of nomination issued to the senatorial candidates after the primaryit would undoubtedly call into question the validity of the certificates of election issued *324 to those candidates after the general election, and such a result would exceed the jurisdiction of the courts of this State. § 17-15-6. In other words, once the general election occurred and the time for Wood to file a contest of the general election under former §§ 17-15-22 to  26 (currently §§ 17-16-49 to -53), Ala.Code 1975, expired, the trial court lost any jurisdiction it had over Wood's claims seeking revocation of the certificates of nomination issued after the primary.
In addition to Wood's failure to file a election contest after the general election, the appellees cite Art. IV, § 46 and § 51, Ala. Const.1901, and this Court's decisions in Nunn v. Baker, 518 So.2d 711 (Ala. 1987), and Buskey v. Amos, 294 Ala. 1, 310 So.2d 468 (Ala.1975), in support of their contention that this Court has no jurisdiction over Wood's claims. Section 51 gives the senate the authority to "judge" the "qualifications" of its members, and this Court has held that where § 51 applies, the judiciary has no jurisdiction to "judge" the qualifications of members of the legislature. See, e.g., Nunn, supra, and Buskey, supra. The appellees argue that the requirements of the FCPA are "qualifications" as that term is used in § 51. Because Barron, Bedford, Little, and Sanders are now members of the senate, the appellees contend that § 51 deprives the judiciary of jurisdiction over Wood's claims alleging violations of the FCPA. Therefore, according to the appellees, the legislature has exclusive jurisdiction over Wood's claims.
Under the appellees' contention that § 51 deprives the courts of jurisdiction over Wood's claims alleging violations of the FCPA, Wood's failure to pursue a contest in the legislature within the framework of §§ 17-16-49 to -53 (formerly §§ 17-15-22 to -26), Ala.Code 1975, is fatal to his claim for judicial relief. But even if we rejected the appellees' contentions regarding § 51, Wood's failure to file a timely election contest is also fatal because of the limitation on the jurisdiction of the courts in § 17-16-44 (formerly § 17-15-6), Ala.Code 1975. Therefore, because of our disinclination to decide constitutional questions unless such a decision is necessary to the result, we affirm the trial court's dismissal of the action, but we express no preference for the competing rationales that lead to the same result. See Hollis v. City of Brighton, 950 So.2d 300, 308-09 (Ala.2006) ("`[T]his Court will affirm a judgment for any reason supported by the record that satisfies the requirements of due process.'" (quoting Smith v. Mark Dodge, Inc., 934 So.2d 375, 380 (Ala. 2006))). Moreover, because this Court could not afford relief to Wood under either rationale, we express no opinion as to the validity of Wood's claim that the penalty of § 17-22A-21 may be enforced against a candidate who is unopposed in a primary and who does not file the reports that former § 17-22A-8(a) (currently § 17-5-8(a)) requires to be filed before the primary.[13]

*325 Conclusion

The judgment of the trial court dismissing Wood's action is affirmed.
AFFIRMED.
COBB, C.J., and SEE, LYONS, STUART, and PARKER, JJ., concur.
SMITH, J., concurs specially.
WOODALL and BOLIN, JJ., concur in the result.
MURDOCK, J., dissents.
SMITH, Justice (concurring specially).
The main opinion declines to address the appellees' argument that Art. IV, § 51, Ala. Const.1901, deprives this Court of jurisdiction over this appeal. I write separately to discuss certain aspects of the appellees' argument regarding § 51, as well as to discuss the relationship of § 51 with Art. IV, § 47, Ala. Const.1901, and the separation-of-powers provisions of the Alabama Constitution.
As the main opinion notes, the appellees contend that the legislature has exclusive jurisdiction over Wood's claims. In support of that position, the appellees cite Art. IV, § 46 and § 51, Ala. Const.1901,[14] and this Court's decisions in Nunn v. Baker, 518 So.2d 711 (Ala.1987), and Buskey v. Amos, 294 Ala. 1, 310 So.2d 468 (1975).
In Nunn, a Democratic party candidate for the Alabama House of Representatives "challenged her party's jurisdiction to certify her opponent rather than her, as its nominee" following the primary election that occurred in June 1986. 518 So.2d at 713. This Court held that it had no jurisdiction because "[h]er opponent was elected and sworn into office well before this case was submitted to [this Court]." 518 So.2d at 713.
Nunn relied on this Court's decision in Buskey.
"In Buskey v. Amos, 294 Ala. 1, 310 So.2d 468 (1975), this Court held that it had lost jurisdiction over an election contest based on a challenge to the residency qualifications of a candidate for the state senate. In Buskey, the challenged candidate had been certified as his party's nominee; his name had been placed on the general election ballot; he had been elected to the state senate by the people of his district; he had been certified by the Secretary of State as having been elected to the senate; and he had taken the oath for the office of state senator, all before the challenge was submitted to this Court. The Court held that it had no jurisdiction over the question of the challenged candidate's residency qualifications after he had taken office, because such questions were constitutionally committed to the state legislature:
"`It is uncontradicted that [the candidate] was certified on November 13, 1974, by [the] Secretary of State, to have been elected to the State Senate in the general election of November 5, 1974, and that [the candidate] took the oath of office as Senator from District 33 on November 11, 1974, and presently occupies that seat in the State *326 Senate. Article 4, Section 46, Alabama Constitution of 1901, provides that "The terms of office of the senators and representatives shall commence on the day after the general election at which they are elected...."
"`Article 4, Section 51, Alabama Constitution of 1901, provides, in reference to the legislature of this state, "Each house shall choose its own officers and shall judge of the election, returns, and qualifications of its members."
"`This court considered the application of Article 4, Section 51, of our state constitution in In re Opinion of the Justices, 254 Ala. 160, 47 So.2d 586 (1950), wherein it was stated:
"`"The Constitutions of most, if not all, of the states contain provisions similar to those quoted above from Section 51 of the Constitution of this state. And it is well settled that such a provision vests the legislature with sole and exclusive power in this regard, and deprives the courts of jurisdiction of those matters."
"`In view of this constitutional provision this court is compelled to hold that it lost jurisdiction of this appeal when the appellee became a member of the State Senate.'
"Buskey v. Amos, 294 Ala. 1, 2, 310 So.2d 468, 468-69 (1975)."
Nunn, 518 So.2d at 712-13.
In the present case, it is undisputed that Lowell Barron, Roger Bedford, Zeb Little, and Hank Sandersthe four candidates whose certificates of nomination Wood sought to have revokedwere administered the oath of office as state senators on November 8, 2006, and were issued certificates of election by the secretary of state on December 29, 2006.[15] This appeal was not submitted to this Court until March 28, 2007. Consequently, the appellees contend that, under Art. IV, § 51, Ala. Const.1901, this Court has no jurisdiction over this appeal.[16]
Wood contends, however, that whether a current member of the legislature has complied with the Fair Campaign Practices Act ("the FCPA") is not a question that Art. IV, § 51, Ala. Const.1901, commits to the legislature; therefore, he argues, § 51 does not prevent this Court from hearing this appeal. To support that argument, Wood relies primarily on the decision of this Court in State ex rel. James v. Reed, 364 So.2d 303 (Ala.1978), and the decision of the United States Supreme Court in Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).
In James, a statutory quo warranto action was brought "challenging the qualifications of Thomas Reed to hold office as a *327 member of the Alabama House of Representatives." 364 So.2d at 304-05. Reed, who had been elected in the general election of 1974, was convicted on July 22, 1977, of attempted bribery, a misdemeanor. 364 So.2d at 305. James, who filed the quo warranto action against Reed, contended that Reed's conviction for attempted bribery made him ineligible for office under Art. IV, § 60, Ala. Const.1901.[17] 364 So.2d at 305. Reed contended, however, that the issue of his eligibility for office was a nonjusticiable political question because, he argued, Art. IV, § 51 and § 53,[18] Ala. Const., "constitute a textually demonstrable constitutional commitment of the issue to the Legislature." 364 So.2d at 305-06 (footnote omitted).
The trial court agreed with Reed and entered a summary judgment in Reed's favor, but this Court reversed and held that § 60 "is a specific constitutional limitation on legislative authority, and judicial enforcement of its mandate does not derogate the principle of separation of powers." 364 So.2d at 306.
In Powell, the United States Supreme Court examined the claim of Adam Clayton Powell, Jr. Powell was elected in November 1966 to serve in the 90th Congress as the representative for the 18th Congressional District of New York, but, "pursuant to a House resolution, he was not permitted to take his seat." 395 U.S. at 489, 89 S.Ct. 1944. Although a House committee found that Powell met the three "standing qualifications" of age, residency, and citizenship stated in U.S. Const. art. I, § 2, for members of the House of Representatives, the House nonetheless voted to "exclude" Powell from membership in the House, and Powell therefore was unable to take his seat as a representative. 395 U.S. at 492-93, 89 S.Ct. 1944.
Powell ultimately sought a declaratory judgment stating that the refusal of the House to seat him as a member was unconstitutional, but the United States District Court for the District of Columbia dismissed his action for lack of subject-matter jurisdiction, a judgment the United States Court of Appeals for the District of Columbia Circuit "affirmed on somewhat different grounds." 395 U.S. at 494, 89 S.Ct. 1944. However, the United States Supreme Court reversed the judgment of the Court of Appeals. 395 U.S. at 550, 89 S.Ct. 1944.
Among other things, the United States Supreme Court construed U.S. Const. art. I, § 5, which provides: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." Similar to the arguments of the appellees in the present case regarding Art. IV, § 51, Ala. Const.1901, the respondents in Powell argued that the question presented was a nonjusticiable political question because, they contended, U.S. Const. art. I, § 5, is a "`textually demonstrable constitutional commitment' to the House of the `adjudicatory power' to determine Powell's qualifications" and "that the House, and the *328 House alone, has power to determine who is qualified to be a member."[19] 395 U.S. at 519, 89 S.Ct. 1944 (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 *329 L.Ed.2d 663 (1962)). The Court disagreed, however, ultimately concluding that the House did not have the power to exclude an elected representative on a "qualification" not stated in the Constitution. 395 U.S. at 548, 550, 89 S.Ct. 1944. The Court explained:
"In order to determine whether there has been a textual commitment to a coordinate department of the Government, we must interpret the Constitution. In other words, we must first determine what power the Constitution confers upon the House through Art. I, § 5, before we can determine to what extent, if any, the exercise of that power is subject to judicial review. Respondents maintain that the House has broad power under § 5, and, they argue, the House may determine which are the qualifications necessary for membership. On the other hand, petitioners allege that the Constitution provides that an elected representative may be denied his seat only if the House finds he does not meet one of the standing qualifications expressly prescribed by the Constitution.
"If examination of § 5 disclosed that the Constitution gives the House judicially unreviewable power to set qualifications for membership and to judge whether prospective members meet those qualifications, further review of the House determination might well be barred by the political question doctrine. On the other hand, if the Constitution gives the House power to judge only whether elected members possess the three standing qualifications set forth in the Constitution, further consideration would be necessary to determine whether any of the other formulations of the political question doctrine are `inextricable from the case at bar.' ...
"....
"In order to determine the scope of any `textual commitment' under Art. I, § 5, we necessarily must determine the meaning of the phrase to `be the Judge of the Qualifications of its own Members.' ... Our examination of the relevant historical materials leads us to the conclusion that ... the Constitution leaves the House without authority to exclude any person, duly elected by his constituents, who meets all the requirements for membership expressly prescribed in the Constitution."
395 U.S. at 520-22, 89 S.Ct. 1944 (footnotes omitted). Accordingly, the Court held "that in judging the qualifications of its members Congress is limited to the standing qualifications prescribed in the Constitution." 395 U.S. at 550, 89 S.Ct. 1944. In other words, the three specific requirements stated in U.S. Const. art. I, § 2, for membership in the House[20]
"impart to the word `qualifications' in Art. I, § 5, `a precise limited nature.' ... Thus, the House's argument that its power to judge the qualifications of its own members is a textually demonstrable commitment of unreviewable authority is `defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership.'"
Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham, 912 So.2d 204, 216 (Ala.2005) (quoting Nixon v. United States, 506 U.S. 224, 237, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (discussing Powell)).
Like U.S. Const. art. I, § 2 and § 3, the Alabama Constitution of 1901 includes detailed *330 qualifications for members of the legislature. Those qualifications are stated in Art. IV, § 47, Ala. Const.1901:
"Sec. 47. Qualifications of senators and representatives.
"Senators shall be at least twenty-five years of age, and representatives twenty-one years of age at the time of their election. They shall have been citizens and residents of this state for three years and residents of their respective counties or districts for one year next before their election, if such county or district shall have been so long established; but if not, then of the county or district from which the same shall have been taken; and they shall reside in their respective counties or districts during their terms of office."
Reading § 47 along with § 51 leads to two related questions. The first question is whether the qualifications stated in § 47 are the minimum qualifications or the exclusive qualifications for membership in the legislature. The second question is whether the legislature's power under § 51 to judge the qualifications of its members extends only to those qualifications listed in § 47 or whether the legislature has the power to judge additional qualifications.
As to the first question, if § 47 provides the exclusive qualifications for membership in the legislature, then the legislature may not create additional qualifications, whether by legislation or otherwise. However, if § 47 provides only the minimum qualifications for membership in the legislature, then the legislature presumably is free to create additional qualifications.
The text of § 47 alone does not expressly answer the question. It does not, for example, expressly state that the listed qualifications are the only qualifications for membership in the legislature or that the legislature is prohibited from creating additional qualifications for office through legislation.[21] The relevant inquiry, therefore, is whether the inclusion of detailed qualifications in § 47 implicitly prohibits the legislature from adding to those qualifications.
In U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995), the United States Supreme Court stated that Powell established that the qualifications stated in the "Qualifications Clauses"[22] of the United States Constitution *331 are the exclusive qualifications for membership in Congress, and therefore held that neither Congress nor the states have the authority to impose additional qualifications for membership in Congress.[23] 514 U.S. at 827, 837-38, 115 S.Ct. 1842. As part of the justification for its conclusion that Congress may not add to the qualifications stated in the Constitution, the Court relied on the maxim expressio unius est exclusio alterius. The Court noted:
"The text of the Qualifications Clauses also supports the result we reached in Powell. John Dickinson of Delaware observed that the enumeration of a few qualifications `would by implication tie up the hands of the Legislature from supplying omissions.' [2 Records of the Federal Convention of 1787 123 (Max Farrand ed., 1911)]. Justice Story made the same point:
"`It would seem but fair reasoning upon the plainest principles of interpretation, that when the constitution established certain qualifications, as necessary for office, it meant to exclude all others, as prerequisites. From the very nature of such a provision, the affirmation of these qualifications would seem to imply a negative of all others.' 1 J. Story, Commentaries on the Constitution of the United States § 625 (3d ed. 1858) (hereinafter Story). See also [C. Warren, The Making of the Constitution 421 (1947)] (`As the Constitution ... expressly set forth the qualifications of age, citizenship, and residence, and as the Convention refused to grant to Congress power to establish qualifications in general, the maxim expressio unius exclusio alterius would seem to apply').
"As Dickinson's comment demonstrates, the Framers were well aware of the expressio unius argument that would result from their wording of the Qualifications Clauses; they adopted that wording nonetheless."
514 U.S. at 793 n. 9, 115 S.Ct. 1842. Thus, the Thornton Court concluded that the enumeration in the Constitution of qualifications *332 for members of Congress implicitly prohibited Congress from supplementing those qualifications.
Although the Alabama Constitution of 1901, like the Federal Constitution for membership in Congress, enumerates qualifications for membership in the legislature, there is a significant difference between the nature of the powers of the Alabama Legislature and those of Congress. Congress may exercise only those powers enumerated to it by the Federal Constitution, along with those implied powers that are "necessary and proper" to carry out its enumerated powers. See U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States...." (emphasis added)); U.S. Const. art. I, § 8 (enumerating several powers of Congress and providing that "Congress shall have Power ... To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers...."); McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). See also Thornton, 514 U.S. at 875, 115 S.Ct. 1842 (Thomas, J., dissenting) ("The reason for Congress' incapacity [to create additional qualifications] is not that the Qualifications Clauses deprive Congress of the authority to set qualifications, but rather that nothing in the Constitution grants Congress this power. In the absence of such a grant, Congress may not act. But deciding whether the Constitution denies the qualification-setting power to the States and the people of the States requires a fundamentally different legal analysis.").
By contrast, the Alabama Constitution of 1901 "`confers on the legislature plenary power to legislate except as restricted by the Constitution, State or federal.'" Schoenvogel v. Venator Group Retail, Inc., 895 So.2d 225, 232 (Ala.2004) (emphasis added) (quoting Ex parte Foshee, 246 Ala. 604, 606, 21 So.2d 827, 829 (1945), citing in turn Art. IV, § 44, Ala. Const.1901; Sisk v. Cargile, 138 Ala. 164, 172, 35 So. 114 (1903)). See also Art. IV, § 44, Ala. Const. 1901 ("The legislative power of this state shall be vested in a legislature, which shall consist of a senate and a house of representatives." (emphasis added)); City of Daphne v. City of Spanish Fort, 853 So.2d 933, 941 (Ala.2003); Ex parte Apicella, 809 So.2d 865, 873 n. 9 (Ala.2001); Broadway v. State, 257 Ala. 414, 417, 60 So.2d 701, 703 (1952); Ex parte Foshee, 246 Ala. at 606, 21 So.2d at 829. This Court has applied the expressio unius maxim in interpreting provisions of the Alabama Constitution. See, e.g., Griggs v. Bennett, 710 So.2d 411, 413-14 (Ala.1998) (construing § 6.14 of Amend. No. 328 (now codified at § 153), Ala. Const.1901, which provides for the filling of vacancies in judicial office); Alabama State Bar ex rel. Steiner v. Moore, 282 Ala. 562, 565, 213 So.2d 404, 406 (1968) (applying the expressio unius maxim to hold that the specific listing in the Constitution of Alabama of 1901 of departments to try impeachments implied the exclusion of departments that were not listed). However, because the power of the Alabama Legislature is plenary, I am not convinced that the expressio unius maxim should operate to limit the legislature's power to add to the qualifications stated in the Alabama Constitution of 1901.[24] Therefore, despite similarities in *333 the qualifications listed in U.S.Const. art. I, § 2 and § 3, and those listed in Art. IV, § 47, Ala. Const.1901, I am not persuaded that § 47 establishes exclusive qualifications, which the legislature may not supplement.
More significantly, this Court has clearly held that where the Alabama Constitution of 1901 does not set forth detailed qualifications for office, the legislature may supplement the general qualifications stated in the constitution. In Finklea v. Farish, 160 Ala. 230, 236, 49 So. 366, 368 (1909), this Court held that changes in the Alabama Constitution of 1901 from earlier constitutions "evinced a purpose to change the policy of the state ... to leave the general qualifications for officeother than those enumerated in section 60to the discretion and determination of the Legislature." More recently, in State ex rel. Graddick v. Rampey, 407 So.2d 823, 825 (Ala.1981), this Court recognized that "it was made clear in Finklea v. Farish, 160 Ala. 230, 49 So. 366 (1909), that the legislature has full authority to impose qualifications for public office in addition to those required by the Constitution." See also State ex rel. Brassell v. Teasley, 194 Ala. 574, 69 So. 723, 725 (1915).
Finklea involved a contest of an election for the office of tax assessor of Monroe County; at issue was § 1467 of the Code of 1907, which disqualified from holding office those individuals who were not qualified electors. 160 Ala. at 233, 49 So. at 367. The election contest in Finklea alleged that the victorious candidate had not complied with the provisions of Art. VIII, § 178, Ala. Const.1901 (since repealed), which required the payment of a poll tax in order to be a qualified elector. Consequently, the election contest alleged that the candidate was not qualified for the office of tax assessor by virtue of § 1467 of the Code of 1907. In that context the Court held that the legislature had the power to create additional qualifications other than the general qualifications stated in the Constitution.
The Finklea Court noted that "[t]here are no detailed qualifications [in the Constitution] in respect to the office of tax assessor," which was in contrast to the "[d]etailed qualifications ... stated in respect to the offices of Senators and Representatives, judges, executive officers of the state, sheriffs, and solicitors. Const.1901, §§ 47, 116, 117, 132, 138, 154, 167." 160 Ala. at 234, 49 So. at 367.
*334 The present case, however, involves a challenge to candidates for the office of state senator, an office for which the Constitution includes specific qualifications in Art. IV, § 47. Thus, an argument could be made that even though the legislature may create additional qualifications for offices that do not have specific constitutional qualifications (such as tax assessor), the legislature may not create additional qualifications for those offices the detailed qualifications for which are set forth in the Constitution (such as state senator). Finklea did not decide that question. See Finklea, 160 Ala. at 234, 49 So. at 367 ("There are no detailed qualifications in respect to the office of tax assessor. It would not therefore impede the progress of the argument of the case in hand should it be conceded that, where the Constitution itself prescribes in detail the qualifications for office, the Legislature may not add to or diminish them.").
However, State ex rel. Moore v. Blake, 225 Ala. 124, 142 So. 418 (1932), involved the legislature's authority to add to the qualifications for the office of sheriffan office Finklea recognized as having specific qualifications outlined in the Constitution. Finklea, 160 Ala. at 234, 49 So. at 367 ("The Constitution contains a number of sections defining and stating qualifications for office. Detailed qualifications are stated in respect to the offices of Senators and Representatives, judges, executive officers of the state, sheriffs, and solicitors."). See also Art. V, § 138, Ala. Const. 1901. Moore held that the legislature has the authority to create additional qualifications for offices for which the Constitution already includes specific qualifications. Moore, 225 Ala. at 126, 142 So. at 419.
In Moore, Herbert Moore was elected sheriff of Colbert County, but before his term began he was convicted of conspiracy to violate the federal prohibition law and was sentenced to imprisonment in the federal penitentiary. 225 Ala. at 125, 142 So. at 419. While Moore appealed his conviction, the Governor declared the office of sheriff of Colbert County vacant in accordance with § 2699, Ala.Code 1923, which provided that a state office is vacated at the time of an incumbent's being sentenced to imprisonment.[25] The Governor then appointed J.H. Blake to fill the vacancy. 225 Ala. 124, 142 So. at 419.
Moore brought a quo warranto action against Blake. Moore argued that § 2699 was unconstitutional because, he contended, the legislature did not have the authority to create additional grounds or procedures for removal of a sheriff other than through impeachment as provided in Art. VII, §§ 173 and 174, Ala. Const.1901. 225 Ala. 124, 142 So. at 419. However, in Stone v. State ex rel. Freeland, 213 Ala. 130, 104 So. 894 (1925), this Court had upheld a predecessor statute to § 2699 (which was identical in wording to § 2699) against a challenge that it violated the impeachment provisions of the Constitution; specifically, the Court in Stone held that the statute was merely an efficient means of enforcing Art. III, § 60, Ala. Const.1901, which prohibited from holding office any person who had been convicted of an "infamous crime." Therefore, the Court held that impeachment was not necessary in the case of a officer who had been convicted of an "infamous crime." Stone, 213 Ala. at 131, 104 So. at 894-95. *335 The sheriff in Moore argued that Stone was distinguishable because, he contended, his conviction was not for an "infamous crime" as that term was used in § 60.
This Court in Moore, however, refused to decide whether the sheriff's conviction was indeed for an "infamous crime." The Court made the following observations regarding Art. IV, § 60, Ala. Const.1901, and the ability of the legislature to create additional qualifications for office:
"[Section 60] has the force of positive law declaring a fixed policy that persons therein named are ineligible to hold office in Alabama. The peace and dignity of the state as dependent upon the character and morale of her public officials is the thought behind it.
"The Legislature has no power, unless elsewhere provided in the Constitution, to make convicted felons of the class named eligible to office. To that extent section 60 is a limitation on legislative power.
"But it is no limitation upon the power of the Legislature to prescribe further qualifications for office, to declare who shall be eligible to hold office in Alabama. This is an inherent legislative power. Finklea v. Farish, 160 Ala. 230, 49 So. 366.
"The case of Stone, County Treasurer, v. State ex rel. Freeland, [213 Ala. 130, 104 So. 894 (1925)], does not limit the application of Code, § 2699, to convictions of the class named in section 60 of the Constitution. That case declares the statute in keeping with the policy expressed in section 60 of the Constitution.
"Impeachment proceedings are for the removal of public officers for malfeasance while lawfully holding the office upon grounds prescribed by section 173 of the Constitution. Due process of law is essential to impeachment.
"But the vice of appellant's position is in confusing causes for removal by impeachment with ineligibility to hold the office.
"....
"Section 2699 goes to the question of eligibility. We do not question the power of the Legislature to declare a public officer convicted by due process of law and sentenced to imprisonment ineligible to further hold the office, and to declare the office vacant unless and until the judgment of conviction is reversed and the sentence to imprisonment vacated."
Moore, 225 Ala. at 126, 142 So. at 419-20 (emphasis added).
Thus, Moore establishes that the legislature may add to the qualifications for office even where the Constitution sets forth detailed qualifications for office; in other words, the detailed qualifications set forth in the Constitution are minimum qualifications, which the legislature may supplement though legislation.[26] Of course, that *336 legislation must not conflict with other provisions of the Constitution. Thus, the legislature may not, for example, enact legislation providing that senators may be only 24 years of age or may reside in this state for only 23 months, because such legislation would contradict the specific qualifications stated in Art. IV, § 47, Ala. Const.1901. Nor may the legislature, as stated in Moore, enact legislation "mak[ing] convicted felons of the class named [in Art. IV, § 60, Ala. Const.1901,] eligible to office." Moore, 225 Ala. at 126, 142 So. at 419.
With that said, no one in the present case challenges the legislature's authority to create the additional qualifications imposed by the FCPA.[27] Instead, the appellees argue that the judiciary has no jurisdiction to hear this appeal because they contend the requirements of the FCPA are "qualifications" as that term is used in Art. IV, § 51, Ala. Const.1901.
The appellees' argument in that regard presents the second question noted above: Does the legislature's power under § 51 to judge the qualifications of its members extend only to those qualifications listed in § 47, or does the legislature also have the power to judge additional qualifications? In James, this Court declined to answer that question:
"[Powell] held that the power of the United States House of Representatives under Art. I, § 5 to judge the qualifications of its members was limited to consideration of constitutional qualifications. Our decision in the case at bar does not require us to so interpret § 51 of the Alabama Constitution and we reserve judgment on that issue."
James, 364 So.2d at 307 n. 2. However, James held that "the legislative power under [Art. IV, §§ 51 and 53,[28] Ala. Const. 1901,] does not operate to the exclusion of the positive force of § 60, a specific constitutional limitation upon the ability of any person to hold public office in this State." 364 So.2d at 307. Section 60, as noted, prohibits any person "convicted of embezzlement *337 of the public money, bribery, perjury, or other infamous crime" from serving in the legislature or "holding any office of trust or profit in this State." Therefore, even though § 60 imposes "qualifications" for office, James makes it clear that the power to "judge" given the legislature by § 51 does not include the power to determine whether a member of the legislature meets the "qualifications" stated in § 60.[29]
As to whether the legislature may judge statutory qualifications (such as a member's compliance with the FCPA), I think § 47 sets forth those qualifications that the legislature has the sole power to judge under § 51; consequently, I do not think § 51 gives the legislature the ability to also judge whatever additional qualifications the legislature decides to create through additional legislation (such as the requirements of the FCPA in the present case).
If indeed the legislature's power to judge qualifications under § 51 extends only to those qualifications stated in § 47, the position advocated by the appellees conflicts with the separation-of-powers provisions of our own state constitution. The power to "judge" is unquestionably a judicial power, which, under Art. III, §§ 42 and 43, Ala. Const.1901, the legislature may not exercise unless specifically authorized to do so by a provision in the Constitution. Section 42 provides:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
Section 43 provides: "In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them ... to the end that it may be a government of laws and not of men." (Emphasis added.)
In that regard, § 51 is a specific example of the Constitution permitting the legislative department to exercise a judicial power. Thus, § 51 takes what is normally a judicial powerthe power of "judging" and authorizes the legislature to exercise that power for the limited purpose of judging *338 the "qualifications" of its members.[30] In my view, this Court, when the question is properly before it, should be careful not to read that poweri.e., the power of the legislature under § 51 to judge the qualifications of its members  more expansively than the Constitution requires.
If this Court held that § 51 precludes the judiciary from exercising jurisdiction in a case challenging compliance by a candidate for, or a member of, the legislature with statutory qualifications, I think § 47 would be deprived of its proper field of operation. Such a decision would hold, in essence, that the legislature has the unreviewable power to create qualifications for its members through legislation and then judge whether a member meets those statutory qualifications. The appellees in the present case have not offered any evidence or argument that persuades me to think that § 51 grants that judicial power to the legislature.
Relevant in this regard is the discussion of the United States Supreme Court in Powell of several historical materials including English and colonial precedents, the debates surrounding the United States Constitutional Convention, and Congressional practice following ratification of the United States Constitution. 395 U.S. at 522-48, 89 S.Ct. 1944. Those materials, the Court concluded, overwhelmingly supported its holding that the power of Congress to judge the qualifications of its members extends only to the three standing qualifications stated in U.S. Const. art. I, § 2. I think those same materials suggest that the power of the Alabama Legislature to judge the qualifications of its members includes the power to judge only those "standing" qualifications stated in § 47 of the Alabama Constitution of 1901.
For example, the Powell Court discussed instances of exclusion by the English Parliament in the 18th century, including the case of John Wilkes, who was expelled or excluded several times by the House of Commons.[31] 395 U.S. at 527-31, 89 S.Ct. 1944. The Court concluded:

*339 "By 1782, after a long struggle, the arbitrary exercise of the power to exclude was unequivocally repudiated by a House of Commons resolution which ended the most notorious English election dispute of the 18th centurythe John Wilkes case....
"....
"With the successful resolution of Wilkes' long and bitter struggle for the right of the British electorate to be represented by men of their own choice, it is evident that, on the eve of the Constitutional Convention, English precedent stood for the proposition that `the law of the land had regulated the qualifications of members to serve in parliament' and those qualifications were `not occasional but fixed.' ... Certainly English practice did not support, nor had it ever supported, respondents' assertion that the power to judge qualifications was generally understood to encompass the right to exclude members-elect for general misconduct not within standing qualifications. With the repudiation in 1782 of the only two precedents for excluding a member-elect who had been previously expelled, it appears that the House of Commons also repudiated any `control over the eligibility of candidates, except in the administration of the laws which define their (standing) qualifications.'"
395 U.S. at 527-29, 89 S.Ct. 1944 (footnotes and citations omitted) (emphasis added).
Ultimately, the Court stated,
"Wilkes' struggle and his ultimate victory had a significant impact in the American colonies. His advocacy of libertarian causes and his pursuit of the right to be seated in Parliament became a cause célèbre for the colonists. `[T]he cry of "Wilkes and Liberty" echoed loudly across the Atlantic Ocean....'... It is within this historical context that we must examine the Convention debates in 1787, just five years after Wilkes' final victory."
395 U.S. at 530-31, 89 S.Ct. 1944 (footnote omitted).
The Powell Court then examined materials surrounding the drafting of the Constitution and its ratification. The matter of qualifications was a subject of much debate at the Convention. Although the delegates to the Convention unanimously adopted the three standing requirements of age, citizenship, and residency, they rejected a proposal that would have authorized the legislative branch to establish property qualifications for members. 395 U.S. at 533, 89 S.Ct. 1944. In speaking against the latter proposal, James Madison
"stat[ed] that the proposal would vest
"`an improper & dangerous power in the Legislature. The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature could regulate those of either, it can by degrees subvert the Constitution. A Republic may be converted into an aristocracy or oligarchy as well by limiting the number capable of being elected, as the number authorised to elect.... It was a power also, which might be made subservient to the views of one faction *340 agst. another. Qualifications founded on artificial distinctions may be devised, by the stronger in order to keep out partizans of [a weaker] faction.'
"Significantly, Madison's argument was not aimed at the imposition of a property qualification as such, but rather at the delegation to the Congress of the discretionary power to establish any qualifications. The parallel between Madison's arguments and those made in Wilkes' behalf is striking.
"In view of what followed Madison's speech, it appears that on this critical day the Framers were facing and then rejecting the possibility that the legislature would have power to usurp the `indisputable right [of the people] to return whom they thought proper' to the legislature."
395 U.S. at 533-35, 89 S.Ct. 1944 (footnotes omitted).
The Powell Court also concluded that materials from the debates over ratification supported the view that Congress could not exclude a member based upon a qualification not set forth in the Constitution. For example, the Court cited
"Hamilton's reply to the antifederalist charge that the new Constitution favored the wealthy and well-born:
"`The truth is that there is no method of securing to the rich the preference apprehended but by prescribing qualifications of property either for those who may elect or be elected. But this forms on part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regulation of the times, the places, the manner of elections. The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature.' The Federalist Papers 371 (Mentor ed.1961). (Emphasis in last sentence added.)
"Madison had expressed similar views in an earlier essay, and his arguments at the Convention leave no doubt about his agreement with Hamilton on this issue."
395 U.S. at 539-40, 89 S.Ct. 1944 (footnotes omitted).
In interpreting § 51 of our own Constitution, I see no reason not to conclude that § 47 enumerates the qualifications that § 51 gives the legislature the power to judge; therefore, although the legislature may create additional qualifications for its members through legislation, § 51 does not (1) give the legislature the power to judge those additional, statutory qualifications, or (2) exclude the judiciary from judging those statutory qualifications. In my view, this interpretation is consistent with the text and structure of our Constitution, prior decisions of this Court applying § 51, and the decision of the United States Supreme Court in Powell. A contrary interpretationone that would allow the legislature the unreviewable authority to judge the qualifications it establishes through legislationwould deny § 47 its proper field of operation.
Of course, this appeal does not properly present the issue of the extent of the power of the legislature under § 51 to judge the qualifications of its members; therefore, I think the Court correctly refuses to address the question. Even so, because of its importance and because the parties to this appeal have extensively briefed it, I offer these thoughts regarding the issue.
MURDOCK, Justice (dissenting).

I. This Case
For the reasons explained in my special writing in Roper v. Rhodes, 988 So.2d 471, 481 (Ala.2008) (Murdock, J., dissenting), I disagree with the conclusion in the main opinion that Wood's failure to pursue *341 an election contest pursuant to §§ 17-15-22 through -26 (currently §§ 17-16-49 through -53), Ala.Code 1975, is fatal to his effort to seek judicial relief for the appellees' alleged violation of the reporting requirements of the Fair Campaign Practices Act. As I said in Roper, the restrictions imposed on the issuance of a certificate of election under § 17-22A-21 (currently § 17-5-18), Ala.Code 1975, do not in my view go to a candidate's "eligibility" for holding office within the meaning of § 17-15-1(2) (currently § 17-16-40(2)), Ala.Code 1975. 988 So.2d at 484 (Murdock, J., dissenting) (relying, among other authority, on this Court's decision in Beatty v. Hartwell, 217 Ala. 239, 115 So. 164 (1927)). Further, I conclude that the "qualifications of its members" of which the senate is to be the sole judge pursuant to Art. IV, § 51, Ala. Const.1901, is a reference only to those "qualifications" prescribed four sections earlier in Art. IV, § 47. In this regard, my view coincides with the view expressed by Justice Smith in her special writing. 990 So.2d at 336 (Smith, J., concurring specially).
Nonetheless, as in Roper, I believe the practical outcome achieved in this case by the trial court's judgment and the affirmance of that judgment by the main opinion is a just one for the reason that the relief sought by Wood should be barred by the doctrine of laches. As a technical matter, however, as in Roper, my views require me to dissent, rather than concur in the result, because they lead to the conclusion that the trial court should have entered a judgment on the merits in favor of the appellees rather than dismissing Wood's action for lack of jurisdiction.

II. Whether the Legislature May Add "Qualifications" to Those Prescribed in § 47, Ala. Const.1901
As Justice Smith notes in her special writing, we are not asked in this case to decide the above question. Nonetheless, Justice Smith takes the opportunity to address this issue; accordingly, I will do the same. As to this issue, I am not inclined to the same conclusion as is Justice Smith.
First, logically, I find the fact that the house and senate each is to be the sole judge of "the qualifications" of its members (except for those qualifications set forth in § 60, Ala. Const.1901), coupled with the conclusion that "the qualifications" of which the house and senate are to be the sole judge are limited to those qualifications set out in § 47 of the Constitution, is inconsistent with the assertion that the legislature can add to the specific qualifications set out in § 47. If it can do so, it would no longer be the sole judge of "the qualifications" of its members.
Moreover, I find the authorities cited in Justice Smith's writing to be extremely supportive of the conclusion that the legislature is not constitutionally empowered to add to the specific qualifications prescribed for the members of the house and senate in § 47. The United States Supreme Court stated in Powell v. McCormack, 395 U.S. 486, 529, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), that "it appears that the House of Commons also repudiated any `control over the eligibility of candidates, except in the administration of the laws which define their (standing) qualifications.'" The Powell Court quoted James Madison as stating that a proposal to allow the legislative branch to establish property qualifications for its members would vest
"`an improper & dangerous power in the Legislature. The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature could regulate those of either, it can by degrees subvert the Constitution.'" *342 395 U.S. at 533-34, 89 S.Ct. 1944 (emphasis added).
I find the warning and the force of reasoning in Mr. Madison's concise statement compelling, and more than sufficient to support the proposition I assert herein.[32] Set out below, however, are responses to some of the additional authorities and thoughts offered by Justice Smith in her special writing.
The first such authority upon which I will comment is the United States Supreme Court's relatively recent decision in U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). In it, the Court held that neither Congress nor the states have the authority to impose additional qualifications for membership in Congress beyond those imposed by the United States Constitution. 514 U.S. at 827, 837-38, 115 S.Ct. 1842. The Thornton Court explained:
"In sum, the available historical and textual evidence, read in light of the basic principles of democracy underlying the Constitution and recognized by this Court in Powell, revealed the Framers' intent that neither Congress nor the States should possess the power to supplement the exclusive qualifications set forth in the text of the Constitution."
514 U.S. at 827, 115 S.Ct. 1842.
I also note that Justice Smith cites Finklea v. Farish, 160 Ala. 230, 49 So. 366 (1909), and a few other Alabama cases in support of her position. In general, those Alabama cases are based, directly or indirectly, on the Court's decision in Finklea.
Acknowledging that which distinguishes the issue in Finklea v. Farish from the issue in this case, the Finklea Court noted that the office in question was the office of tax assessor and then explained:
"The Constitution contains a number of sections defining and stating qualifications for office. Detailed qualifications are stated in respect to the offices of Senators and Representatives, judges, executive officers of the state, sheriffs, and solicitors. Const.1901, §§ 47, 116, 117, 132, 138, 154, 167. There are no detailed qualifications in respect to the office of tax assessor. It would not therefore impede the progress of the argument of the case in hand should it be conceded that, where the Constitution itself prescribes in detail the qualifications for office, the Legislature may not add to or diminish them."
160 Ala. at 234, 49 So. at 367 (emphasis added). The Court then went on to reason that, unlike the constitutional qualifications prescribed for senators and representatives, the only constitutional qualifications affecting tax assessors are those general qualifications that affect all officers of the state (such as those in § 60 referencing conviction for infamous crimes and in Art. XVII, § 280, Ala. Const.1901, prohibiting the holding of two offices of profit at once). *343 The prescription of such general qualifications, the court concluded, did not preempt the legislature from making its own decision as to what detailed qualifications ought to exist for the office of tax assessor. Finklea, 160 Ala. at 236, 49 So. at 368.
Similarly, the case of State ex rel. Graddick v. Rampey, 407 So.2d 823 (Ala.1981), was concerned with the qualifications for the office of mayor, not one of the offices for which the Alabama Constitution provides detailed qualifications. It relied upon Finklea to address whether § 60, Ala. Const.1901, prohibited the legislature from enacting additional restrictions on holding that office that related to criminal convictions.
Justice Smith's special writing relies significantly on State ex rel. Moore v. Blake, 225 Ala. 124, 142 So. 418 (1932). I note first, however, that Moore relied upon the Court's earlier decision in Finklea. It cited no authority other than Finklea for the following statement: "But it is no limitation upon the power of the Legislature to prescribe further qualifications for office, to declare who shall be eligible to hold office in Alabama. This is an inherent legislative power. Finklea, 160 Ala. 230, 49 So. 366." Moore, 225 Ala. at 126, 142 So. at 419. Moore appears, therefore, to rely upon Finklea for the proposition that the legislature generally has the "inherent legislative power" to "prescribe further qualifications for office." To that extent, Moore misreads, and expands the holding in, Finklea, which was explicitly limited to consideration of state offices for which the Constitution does not provide detailed qualifications.
In actuality, however, I do not believe Moore can be or should be read so broadly in light of two additional considerations. The first is that Moore was focused on whether § 60 of the Constitution implied a limitation on the authority of the legislature to prescribe further qualifications for office related to the absence of criminal convictions. Even more significantly, Moore was concerned with the authority of the legislature to prescribe additional qualifications for the office of sheriff. Despite Finklea's earlier lumping of the office of sheriff with several other constitutional offices for which the Constitution does provide detailed qualifications, 160 Ala. at 234, 49 So. at 367, Art. V, § 138, Ala. Const. 1901, provides no such detailed qualifications for the office of sheriff. It provides only that a sheriff is to be "elected in each county by the qualified electors thereof."[33]
Finally, I note that Justice Smith argues that there is a difference in the federal and Alabama constitutions in relation to the enumerated powers of the United States Congress, see United States Constitution, Art. I, § 8, as compared to the more plenary legislative power of the Alabama Legislature. Whatever force that difference might have added to the position urged by Justice Smith if we were considering this matter during the earlier years of this nation, it is far less so in light of the breadth of congressional power recognized by the United States Supreme Court during the past century. Moreover, the reasoning of the Court in Powell and Thornton did not depend upon the fact that Congress's powers are specifically enumerated in Art. I, § 8. Instead, the Court's reasoning focused on an analysis of the very provision of the United States Constitution, *344 Art. I. § 2, that finds its analog in § 47 of the Alabama Constitution.[34] As the Supreme Court explained in Thornton:
"Our conclusion that Congress may not alter or add to the qualifications in the Constitution was integral to our analysis and outcome [in Powell].... Only two Terms ago, we confirmed this understanding of Powell in Nixon v. United States, 506 U.S. 224 (1993). After noting that the three qualifications for membership in Art. I, § 2, are of `a precise, limited nature' and `unalterable by the legislature' we explained:
"`Our conclusion in Powell was based on the fixed meaning of "[q]ualifications" set forth in Article I, § 2. The claim by the House that its power to "be the Judge of the Elections, Returns and Qualifications of its own Members" was a textual commitment of unreviewable authority was defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership.' Id. at 237."
Thornton, 514 U.S. at 796, 115 S.Ct. 1842 (footnote omitted) (some emphasis added). Moreover, the warnings by Mr. Madison and other Framers of danger to our republican and constitutional form of government, as embraced by the United States Supreme Court in these cases, easily transcend the stated difference in the two constitutions.
NOTES
[1] Beth Chapman now holds the office Nancy Worley held when Wood filed this action.

Rule 25(d)(1), Ala. R. Civ. P., provides:
"When a public officer is a party to an action in an official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution."
See also Rule 43(b), Ala. R.App. P.
[2] The original complaint did not name Barron, Bedford, Little, or Sanders as parties to the action. Wood later amended his complaint to name Barron, Bedford, Little, and Sanders as defendants.
[3] Act No. 2006-570, Ala. Acts 2006, which took effect on January 1, 2007, reorganized and amended Title 17, Ala.Code 1975. Unless otherwise noted, all citations in this opinion are to the prior version of Title 17, which was in effect at the time the present action was filed.

In the revised Title 17, the FCPA is codified at § 17-5-1 et seq., Ala.Code 1975. The revised Title 17 is found in Volume 13A of the Code of Alabama 1975; that volume includes a "Disposition Table" indicating the disposition of sections from Title 17 before the enactment of Act No. 2006-570.
[4] Section 17-22A-4 (currently § 17-5-4) of the FCPA requires a candidate for office to file a statement with the secretary of state or judge of probate, as provided in § 17-22A-9 (currently § 17-5-9), showing, among other things, the names of the individuals serving as the principal campaign committee for the candidate. Wood alleged that before the primary Barron, Bedford, Little, and Sanders had failed to comply with former § 17-22A-8(a) (currently § 17-5-8), which then provided:

"The treasurer of each principal campaign committee or other political committee shall file with the Secretary of State or judge of probate, as designated in Section 17-22A-9, reports of contributions and expenditures at the following times in any year in which an election is held:
"(1) Forty-five days before and between 10 and five days before the date of any election for which a political committee receives contributions or makes expenditures with a view toward influencing such election's result;
"(2) Provided, however, that a report shall not be required except between five and 10 days before a run-off election."
[5] The next day, two additional voters moved to intervene.
[6] Wood filed materials in opposition to the intervenors' motion to intervene and motion for a change of venue. After the Autauga Circuit Court granted the motion to intervene, Wood filed a motion to vacate that order; the Autauga Circuit Court's order transferring the case reserved for the Montgomery Circuit Court the issue whether the order allowing intervention should be vacated.
[7] The cross-appeal, case no. 1061019, was stayed by order of this Court pending resolution of this appeal (case no. 1060953).
[8] Like Wood's complaint, the Ropers' action sought four remedies: a declaratory judgment, an injunction, a writ of mandamus, and a writ of quo warranto. 988 So.2d at 473.
[9] See § 17-13-5(c) (formerly § 17-16-11(c)), Ala.Code 1975, which states, in pertinent part:

"If a legally qualified candidate for nomination to an office is unopposed when the last date for filing declarations of candidacy has passed, his or her name shall not appear on the ballots to be used in the primary election, and he or she shall be the nominee of the party with which he or she has qualified for the office."
See also Roper, 988 So.2d at 481 n. 11 (Bolin, J., concurring specially), in which Justice Bolin explains:
"Of the three types of elections, only general elections permit write-in candidates. See §§ 17-6-27 and 17-7-21(b)(8) (formerly §§ 17-8-5 and 17-24-3(b)(8)) for general elections and § 11-46-25(g) and (h) for mayor-council elections. Therefore, only in general elections are unopposed candidates required to have their names printed on election ballots and stand for election, because a write-in candidate could conceivably win the election by receiving more votes than did a party nominee or independent candidate whose name appears on the ballot. However, because there is no statutory provision for write-in voting in either municipal or primary elections, a candidate who is the only person who qualifies for mayor or a council position in a municipal election, or a candidate who is the sole qualifier for any elected position in a partisan primary election, is the automatic winner of the respective office or nomination and is not listed as a candidate on the ballot in the election."
(Emphasis added.)
[10] Certain provisions of §§ 17-16-70 to -89 suggest that the procedures for contesting a primary election also apply to a nominee selected through an uncontested primary. See, e.g., § 17-16-71(2) (currently § 17-13-71(2)), Ala.Code 1975, which provides that the "nomination by a party for office, other than a county office," may be contested "[w]hen a person whose nomination is contested was not eligible to the office sought at the time of the declaration of nomination" (emphasis added). However, other provisions suggest that the procedures are available only to contest a nominee selected through a primary election. See, e.g., § 17-16-78(a) (currently § 17-13-78(a)), Ala.Code 1975, which then stated:

"Any elector of a party desiring to contest the nomination by his party of any candidate declared the nominee for any office shall make a statement setting forth specifically:
"(1) The name of the party contesting and that he was a qualified elector when the primary was held and he participated therein;
"(2) The nomination which said election was held to fill;
"(3) The time of holding the election...."
(Emphasis added.)
[11] We recognized this exception to the jurisdictional limitation stated in former § 17-15-6 (currently § 17-16-44) in King v. Campbell, 988 So.2d 969, 977 (Ala.2007) (quoting Dennis v. Prather, 212 Ala. 449, 103 So. 59 (1925)). Unlike King, which involved a claim that the election was void because the challenged office filled at that election was unconstitutional, the present case involves a claim that, because of alleged violations of the FCPA, a particular candidate was ineligible as a candidate for an otherwise valid office. Moreover, Wood does not argue that the Dennis exception applies in the present case.
[12] Act No. 2006-570, Ala. Acts 2006, amended and renumbered § 17-22A-21; the amended version of § 17-22A-21 is codified at § 17-5-18. Section 17-5-18 is essentially the same as former § 17-22A-21; the only change in the current version is that the legislature has replaced the word "county" in the second sentence with the word "local." See generally Etheridge v. State ex rel. Olson, 730 So.2d 1179 (Ala. 1999), in which this Court construed former § 17-22A-21 and stated:

"After carefully reexamining [City of Talladega v.] Pettus[, 602 So.2d 357 (Ala. 1992),] and [Ex parte] Krages, [689 So.2d 799 (Ala. 1997),] we conclude that Pettus interpreted § 17-22A-21 in the only way that it could be interpreted without violating the separation-of-powers doctrine and judicially legislating. As was noted in Pettus, § 17-22A-2(7), part of the `Definitions' section of the FCPA, provides this definition:
"`LOCAL OFFICE. Any office under the constitution and laws of the state, except circuit, district or legislative offices, filled by election of the registered voters of a single county or municipality, or by the voters of a division contained within a county or municipality.'
"The second sentence of § 17-22A-21 states:
"`A certificate of election or nomination already issued to any person elected or nominated to state or county office who fails to file any statement or report required by this chapter shall be revoked.'
"(Emphasis added.) Section 17-22A-21 is not ambiguous. It means what it says, and the term `local office' is specifically defined in the definitions section of the FCPA. The word `county,' instead of the defined term `local office,' is used in the second sentence of § 17-22A-21....
"Therefore, consistent with the rationale of the lead opinion in Pettus, we hold that a certificate of election to a municipal office is not subject to revocation for failure of the person elected to comply with the FCPA and, therefore, that the trial court had no jurisdiction to revoke the certificate of election issued to Ms. Etheridge.
"We note again, as we have done on previous occasions, that a court does not have jurisdiction to interfere in an election result unless a statute authorizes it to do so. The Legislature has made this abundantly clear. See § 17-15-6. We strongly urge the Legislature to reexamine § 17-22A-21. If in enacting that provision the Legislature meant for the term `county office' to mean `local office,' it can, and should, amend § 17-22A-21 by substituting the word `local' for the word `county' in the second sentence."
730 So.2d at 1182 (emphasis added).
[13] The attorney general has issued an opinion stating that a candidate who is unopposed in the primary election must nevertheless file the reports required by § 17-22A-8(a) before that primary or else face the penalty provision of former § 17-22A-21 (currently § 17-5-18). See Op. Att'y Gen. No. 2006-142 (Sept. 7, 2006). However, an earlier opinion of the attorney general concluded that a candidate who is unopposed in the primary election does not have to file those reports before the primary. See Op. Att'y Gen. No. 90-224 (April 19, 1990). See also Water Works & Sewer Bd. of Talladega v. Consolidated Publ'g, Inc., 892 So.2d 859, 866 n. 5 (Ala.2004) ("`While an opinion of the attorney general is not binding, it can constitute persuasive authority.'") (quoting Alabama-Tennessee Natural Gas Co. v. Southern Natural Gas Co., 694 So.2d 1344, 1346 (Ala.1997)).
[14] Section 46 provides:

"(a) Senators and representatives shall be elected by the qualified electors on the first Tuesday after the first Monday in November... and in every fourth year thereafter. The terms of office of the senators and representatives shall commence on the day after the general election at which they are elected, and expire on the day after the general election held in the fourth year after their election, except as otherwise provided in this Constitution...."
Section 51 provides: "Each house shall choose its own officers and shall judge of the election, returns, and qualifications of its members."
[15] Senators Barron, Bedford, Little, and Sanders have been recognized by the state senate as elected members, have participated as state senators, and have voted as state senators since that time.
[16] Specifically, the appellees argue:

"Pursuant to § 51 of the Constitution of Alabama of 1901, only the Alabama State Senate shall judge the election, returns, and qualifications of its members including Senators Barron, Bedford, Little and Sanders. This case and the issues and questions presented are constitutionally committed to the State Senate. Section 51 of the Alabama Constitution vests the State Senate with the sole and exclusive power in regard to this case and the issues and questions presented. The judicial system and this Honorable Court lost jurisdiction when the Senators became members of the Alabama State Senate. See Buskey ... and Nunn...."
(Appellees' motion to dismiss appeal, p. 2.)
[17] Article IV, § 60, Ala. Const.1901, provides: "No person convicted of embezzlement of the public money, bribery, perjury, or other infamous crime, shall be eligible to the legislature, or capable of holding any office of trust or profit in this State."
[18] Article IV, § 53, Ala. Const.1901, provides:

"Each house shall have power to determine the rules of its proceedings and to punish its members and other persons, for contempt or disorderly behavior in its presence; to enforce obedience to its processes; to protect its members against violence, or offers of bribes or corrupt solicitation; and with the concurrence of two-thirds of the house, to expel a member, but not a second time for the same offense; and the two houses shall have all the powers necessary for the legislature of a free state."
[19] Rather than suggesting that this appeal presents a nonjusticiable political question, the appellees argue that this Court does not have subject-matter jurisdiction over the appeal. In Powell, the United States Supreme Court discussed the difference between whether an issue is justiciable and whether a court has jurisdiction over the subject matter of a particular issue:

"As we pointed out in Baker v. Carr, 369 U.S. 186, 198 (1962), there is a significant difference between determining whether a federal court has `jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is `justiciable.' The District Court determined that `to decide this case on the merits ... would constitute a clear violation of the doctrine of separation of powers' and then dismissed the complaint `for want of jurisdiction of the subject matter.' ... However, as the Court of Appeals correctly recognized, the doctrine of separation of powers is more properly considered in determining whether the case is `justiciable.' We agree with the unanimous conclusion of the Court of Appeals that the District Court had jurisdiction over the subject matter of this case....
"In Baker v. Carr, supra, we noted that a federal district court lacks jurisdiction over the subject matter (1) if the cause does not 'arise under' the Federal Constitution, laws, or treaties (or fall within one of the other enumerated categories of Art. III); or (2) if it is not a `case or controversy' within the meaning of that phrase in Art. III; or (3) if the cause is not one described by any jurisdictional statute."
395 U.S. at 512-13, 89 S.Ct. 1944 (footnote omitted). The respondents in Powell contended that U.S. Const. art. I, § 5, was an explicit grant of "judicial power" to Congress to "judge" the qualifications of its members, and the respondents therefore argued that the Court did not have subject-matter jurisdiction over Powell's claim. 395 U.S. at 513-14, 89 S.Ct. 1944. The Court disagreed, however. It first noted that U.S. Const. art. III, § 1, provides that the "`judicial Power ... shall be vested in one supreme Court, and in such inferior Courts as the Congress may ... establish'" and that U.S. Const. art. III, § 2, "mandates that the `judicial Power shall extend to all Cases ... arising under this Constitution.'" 395 U.S. at 514, 89 S.Ct. 1944. Citing Bell v. Hood, 327 U.S. 678, 685, 66 S.Ct. 773, 90 L.Ed. 939 (1946), for the proposition that "a suit `arises under' the Constitution if a petitioner's claim `will be sustained if the Constitution ... [is] given one construction and will be defeated if [it is] given another,'" the Court concluded that Powell's claim "clearly is one `arising under' the Constitution as the Court has interpreted that phrase." 395 U.S. at 514, 89 S.Ct. 1944 (footnote omitted).
Textual differences between the United States Constitution and the Alabama Constitution arguably would justify a different conclusion in the present case regarding whether Art. IV, §§ 46 and 51, Ala. Const.1901, limits this Court's subject-matter jurisdiction or merely renders the question nonjusticiable. Most significantly, unlike the United States Constitution, in which the doctrine of separation of powers is implied, Alabama's Constitution expressly provides for the separation of powers. Art. III, §§ 42-43, Ala. Const.1901. In addition, as far as I am aware, the Alabama Constitution does not include a provision comparable to U.S. Const. art. III, § 2, which "mandates that the `judicial Power shall extend to all Cases ... arising under this Constitution.'" Compare U.S. Const. art. III, § 2 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."), with Art. VI, § 139, Ala. Const. 1901 (Off.Recomp.), which provides:
"Except as otherwise provided by this Constitution, the judicial power of the state shall be vested exclusively in a unified judicial system which shall consist of a supreme court, a court of criminal appeals, a court of civil appeals, a trial court of general jurisdiction known as the circuit court, a trial court of limited jurisdiction known as the district court, a probate court and such municipal courts as may be provided by law."
(Emphasis added.)
Despite those differences, however, I think that the discussion in Powell of the justiciability of examining the power of the legislative branch to judge the qualifications of its members is instructive.
[20] Those three requirements are that a member must have attained the age of 25 years, must have been a citizen of the United States for 7 years, and must be an inhabitant of the state from which he or she is elected. U.S. Const. art. I, § 2.
[21] Section 47 could have been drafted to clearly state that the qualifications listed therein are exclusive. For example, with regard to the qualifications for being a state senator, § 47 could have stated:

"Every person who is at least twenty-five years of age; who has been a citizen and resident of this state for three years and a resident of his respective county or district for one year next before his election, if such county or district shall have been so long established, but if not, then of the county or district from which the same shall have been taken; who resides in his respective county or district during his term of office; and who is not otherwise ineligible under another provision of this Constitution shall be eligible to be a senator."
See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 867-68, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Thomas, J., dissenting) (making a similar argument regarding the qualifications for membership in Congress set forth in U.S. Const. art. I).
[22] The Court offered the following description of the term "Qualifications Clauses":

"`In addition to the three qualifications set forth in Art. I, § 2, Art. I, § 3, cl. 7, authorizes the disqualification of any person convicted in an impeachment proceeding from "any Office of honor, Trust or Profit under the United States"; Art. I, § 6, cl. 2, provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office"; and § 3 of the 14th Amendment disqualifies any person "who, having previously taken an oath ... to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof." It has been argued that each of these provisions, as well as the Guarantee Clause of Article IV and the oath requirement of Art. VI, cl. 3, is no less a "qualification" within the meaning of Art. I, § 5, than those set forth in Art. I, § 2.' Powell v. McCormack, 395 U.S. 486, 520, n. 41 (1969).
"In Powell, we saw no need to resolve the question whether those additional provisions constitute `qualifications,' because `both sides agree that Powell was not ineligible under any of these provisions.' Ibid. We similarly have no need to resolve that question today: Because those additional provisions are part of the text of the Constitution, they have little bearing on whether Congress and the States may add qualifications to those that appear in the Constitution."
514 U.S. at 787 n. 2, 115 S.Ct. 1842.
[23] At issue in Thornton was "an amendment to the Arkansas State Constitution that prohibit[ed] the name of an otherwise-eligible candidate for Congress from appearing on the general election ballot if that candidate ha[d] already served three terms in the House of Representatives or two terms in the Senate." 514 U.S. at 783, 115 S.Ct. 1842. In a 5-4 decision, the United States Supreme Court held that the amendment was unconstitutional. 514 U.S. at 837-38, 115 S.Ct. 1842. Specifically, the Court held:

"[T]he available historical and textual evidence, read in light of the basic principles of democracy underlying the Constitution and recognized by this Court in Powell, reveal the Framers' intent that neither Congress nor the States should possess the power to supplement the exclusive qualifications set forth in the text of the Constitution."
514 U.S. at 827, 115 S.Ct. 1842.
[24] Courts have reached conflicting results when confronted with whether to apply the expressio unius maxim to limit the legislature's power under state constitutions. See, e.g., Eberle v. Nielson, 78 Idaho 572, 306 P.2d 1083 (1957), which states:

"In construing our State Constitution there are also certain fundamental principles which must be recognized and given effect. Unlike the Federal Constitution, the State Constitution is a limitation, not a grant, of power. We look to the State Constitution, not to determine what the legislature may do, but to determine what it may not do. If an act of the legislature is not forbidden by the state or federal constitutions, it must be held valid.
"This fundamental concept of the State Constitution is generally accepted throughout the United States, and is not questioned in these proceedings. It has always been the guiding principle of constitutional construction in this state....
"There flows from this fundamental concept, as a matter of logic in its application, the inescapable conclusion that the rule of expressio unius est exclusio alterius has no application to the provisions of our State Constitution."
78 Idaho at 578, 306 P.2d at 1086 (footnote omitted). But compare, e.g., Reale v. Board of Real Estate Appraisers, 880 P.2d 1205, 1206-11 (Colo. 1994) (applying the expressio unius maxim and concluding that certain qualifications stated in the Colorado constitution were exclusive rather than minimum qualifications), with dissent in Reale, 880 P.2d at 1213 (Erickson, J., dissenting) ("The majority finds an implied limitation upon the General Assembly's power based upon the doctrine of `expressio unius est exclusio alterius' (the inclusion of one thing is the exclusion of another). The analysis based upon the doctrine is flawed. The doctrine of `expressio unius est exclusio alterius' is inapt when the constitution limits, rather than grants, power. When a constitution grants authority, no more than what is specifically enumerated is granted." (footnote omitted)).
[25] Section 2699 provided:

"When any person, holding any office or place under the authority of this state, is sentenced by any court of the United States, of this state, or any state, to imprisonment in the penitentiary, or hard labor for the county, his office or place is vacated from the time of the sentence; and if the judgment is reversed, he must be restored; but if pardoned, he must not."
[26] To borrow a metaphor sometimes used in reference to the greater protection of individual liberties that may be available under state constitutions than is available under the Federal Constitution, the qualifications for office outlined in the Constitution are, in my view, a "floor" that the legislature may elect to go above but not below. See Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) ("Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so."); see also PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) ("[T]he State [may] exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution."). However, any additional qualifications the legislature creates through legislation must comply with other constitutional provisions, including those providing for the separation of powers.
[27] Similarly, the parties do not dispute that the requirements of the FCPA are "qualifications" for office in a general sense. Instead, the parties dispute whether Art. IV, § 51, gives the legislature exclusive jurisdiction to "judge" whether a member of the legislature has complied with the requirements of the FCPA.
[28] Section 53 states that each house of the legislature has the power to "expel" a member "with the concurrence of two-thirds of the house." The power to "expel" is different from the power to "exclude" that the House purported to exercise in Powell, because an individual may not be expelled from membership until he has first been admitted as a member. The House "excluded" Powell i.e., it refused to seat himand therefore its vote to exclude him could not be construed as a vote to "expel" him. Powell, 395 U.S. at 507 n. 27, 89 S.Ct. 1944 ("Powell was `excluded' from the 90th Congress, i.e., he was not administered the oath of office and was prevented from taking his seat. If he had been allowed to take the oath and subsequently had been required to surrender his seat, the House's action would have constituted an `expulsion.'").

The respondents in Powell argued that the House could expel a member by a two-thirds vote for any reason, but, because it concluded the House had "excluded" rather than "expelled" Powell, the Court declined to address that question. 395 U.S. at 507 & n. 27, 89 S.Ct. 1944 ("[W]e express no view on what limitations may exist on Congress' power to expel or otherwise punish a member once he has been seated.").
Under the Alabama Constitution, the legislature's power to expel appears to be more limited than the power stated in U.S. Const. art. I, § 5, because Art. IV, § 53, Ala. Const. 1901, provides that a member may not be expelled "a second time for the same offense."
[29] The dissent asserts that it is logically inconsistent to conclude that the legislature's power under § 51 to judge the qualifications of its members is limited to those qualifications set forth in § 47, while at the same time concluding that the legislature can "add to the specific qualifications set out in § 47." 990 So.2d at 341. The dissent argues that if both of those statements are true, the legislature is no longer the sole judge of the qualifications of its members. However, I see a logical distinction  which I think the Alabama Constitution establishes  between the legislature's having the power to act as the sole judge of only those qualifications stated in § 47 and the legislature's having the more expansive power of acting as the sole judge of a member's compliance with additional qualifications that the legislature has created through legislation or otherwise.

James, supra, makes it clear that the legislature is not the sole judge of the qualifications stated in Art. IV, § 60, Ala. Const.1901. Therefore, § 60 is a clear limitation on the ability of the legislature to judge the qualifications of its members. Furthermore, as I explain in the main text of this writing, infra, I read § 51 as conferring a specific judicial powerthe power to "judge"on the legislature, and I think § 47 limits the judicial power that § 51 confers on the legislature.
Contrary to the view expressed in the dissent, however, I am not persuaded that § 47 limits the legislature's ability to create additional qualifications through legislation. In that regard, I think the Alabama Constitution differs from the Federal Constitution. Even so, I read the separation-of-powers provisions of the Alabama Constitution as preventing the legislature from acting as the sole judge of whatever additional qualifications it creates.
[30] Buskey, supra, is consistent with this view, because it involved an election contest challenging a state senator's compliance with residency qualifications. 294 Ala. at 2, 310 So.2d at 468-69. The basis of the underlying action in Nunn, supra, is not clearly stated in the limited factual background provided in the Nunn opinion, which notes only that a Democratic party candidate for the Alabama House of Representatives "challenged her party's jurisdiction to certify her opponent rather than her, as its nominee." 518 So.2d at 713.
[31] The Court explained:

"While serving as a member of Parliament in 1763, Wilkes published an attack on a recent peace treaty with France, calling it a product of bribery and condemning the Crown's ministers as `"the tools of despotism and corruption."' Wilkes and others who were involved with the publication in which the attack appeared were arrested. Prior to Wilkes' trial, the House of Commons expelled him for publishing `a false, scandalous, and seditious libel.' Wilkes then fled to France and was subsequently sentenced to exile.
"Wilkes returned to England in 1768, the same year in which the Parliament from which he had been expelled was dissolved. He was elected to the next Parliament, and he then surrendered himself to the Court of King's Bench. Wilkes was convicted of seditious libel and sentenced to 22 months' imprisonment. The new Parliament declared him ineligible for membership and ordered that he be `expelled this House.' Although Wilkes was re-elected to fill the vacant seat three times, each time the same Parliament declared him ineligible and refused to seat him.54
"Wilkes was released from prison in 1770 and was again elected to Parliament in 1774. For the next several years, he unsuccessfully campaigned to have the resolutions expelling him and declaring him incapable of re-election expunged from the record. Finally, in 1782, the House of Commons voted to expunge them, resolving that the prior House actions were `subversive of the rights of the whole body of electors of this kingdom.'
54 The issue before the Commons was clear: Could the Commons `put in any disqualification, that is not put in by the law of the land.' The affirmative answer was somewhat less than resounding. After Wilkes' third re-election, the motion to seat his opponent carried 197 to 143."
395 U.S. at 527-28, 89 S.Ct. 1944 (footnotes and citations omitted).
[32] The Powell Court continued by noting that

"Madison's argument was not aimed at the imposition of a property qualification as such, but rather at the delegation to the Congress of the discretionary power to establish any qualifications."
395 U.S. at 534, 89 S.Ct. 1944. The Court concluded that "on th[e] critical day [of Madison's speech] the Framers were facing and then rejecting the possibility that the legislature would have power to usurp the `indisputable right [of the people] to return whom they thought proper' to the legislature." 395 U.S. at 535, 89 S.Ct. 1944 (footnote omitted).
Elsewhere the Powell Court quoted Alexander Hamilton's conclusion that "[t]he qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature."' 395 U.S. at 539, 89 S.Ct. 1944 (emphasis in Powell; quoting The Federalist Papers 371 (Mentor ed.1961)).
[33] Nor do I find the other cases cited in Justice Smith's special writing to provide any precedent or reasoning that is in any relevant manner inconsistent with the conclusion I have reached on the issue at hand. See Stone v. State ex rel. Freeland, 213 Ala. 130, 104 So. 894 (1925) (to the same effect as Moore); State ex rel. Brassell v. Teasley, 194 Ala. 574, 579, 69 So. 723, 725 (1915) (applying Finklea to a case involving a city commissioner).
[34] As Justice Smith notes, part of the United States Supreme Court's justification for its conclusion that Congress may not add to the qualifications stated in the United States Constitution is the application of the maxim expressio unius est exclusio alterius to Art. I, § 2. See Thornton, 514 U.S. at 793, n. 9, 115 S.Ct. 1842. Although the Court in Thornton did note the enumerated nature of the rights of the federal government under Article I, it did so for the purpose of contradistinguishing the nature of those federal rights from the rights reserved to the states in the context of explaining that states are not permitted to add to the qualifications of members of Congress as prescribed in the Federal Constitution. See 514 U.S. at 847, 115 S.Ct. 1842.